SHAINBERG v. DACUS.

5-2418 346 S. W. 2d 462

Opinion delivered May 22, 1961.

*Frierson, Walker & Snellgrove,* for appellant.
*H. H. McAdams, Penix & Penix,* for appellee.

CARLETON HARRIS, Chief Justice. This is a Workmen's Compensation case. Charles Nolan Dacus was employed in the S & S Department Store, operated by Victor Shainberg and Harry Samuels, having been so employed for a long number of years.[1] Principally, he served as a clerk, but one of his duties consisted of dressing show windows. During the week commencing January 27th, Dacus was engaged in changing display windows, including removing the background from the ladies' window, and remodeling the ceilings and floor. According to the testimony, Dacus was unable to continue with the carpentry after January 31st, due to intense pain in his right leg. He returned to stock work until February 5th, at which time he left the job and went home, and to bed. On February 9th, Dacus was referred to the Kennedy General Hospital in Memphis, by Dr. John T. Gray, an orthopedic surgeon of Jonesboro. Surgery was performed on February 24th. A claim was filed by Dacus, wherein it was contended that he had suffered an accidental injury arising out of, and in the course of, his employment, such injury aggravating a pre-existing back condition; further, that he was temporarily totally disabled from February 5th to April 15th, 1958; that he had incurred medical and hospital bills, and had a 5% permanent partial disability to his body as a whole. Claim was denied by the Referee, who found that Dacus had failed to establish that he had sustained an accidental injury arising out of and during the course of employment. The full Commission, after reviewing the testimony, reversed the opinion of the Referee, and awarded compensation as sought. The findings of the Commission were affirmed by the Craighead County Circuit Court. From the judgment of such court, comes this appeal.

The proof consisted of the testimony of Mr. Dacus, his wife, Ruth Dacus, Victor Shainberg, and the deposition of Dr. Gray, together with various exhibits. The

[1] Dacus had earlier been employed by C & S Department Store, the predecessor of S & S.

evidence reflected that Dacus lived[2] on a 190-acre farm near Jonesboro, and that he had engaged in operating a tractor and mowing machine on the farm since 1951. Dacus testified that he first hurt his back in 1954. "It happened on a Sunday. I had a regular water bucket which I believe is ten quarts, two and a half gallons, with oats in it, and I was walking across a level field and my back just gave way." Subsequently, at the suggestion of Dr. Gray, Dacus slept on a plywood board, with a thin mattress, and was advised to take "heat treatments, diathermy treatments." He testified that he took the treatments for about ten days, and the pain suddenly ceased. He was next afflicted with pain in November, 1957, all the pain occurring in the calf of the leg. During November and December, the pain gradually ascended from the calf to the thigh; however, he went duck hunting on November 7th and 14th, and hunted rabbits and birds in December, 1957, and January, 1958. According to his testimony, he last went hunting sometime prior to January 19th. Dacus stated that after walking awhile, pain in the calf of the leg, or thigh, would disappear, but upon arising in the morning, the pain would again commence. Dacus worked in the store all during the month, and on January 21st, went to Dr. Grover Poole, the family physician, who prescribed some tablets. On January 23rd, he again went to Dr. Gray. The doctor was not present at the office, but Dacus was given a diathermy treatment by the nurse. On January 24th, he was given another diathermy treatment by Dr. Gray. During this entire week, he continued his usual work as a salesman. On Monday, January 27th, work was begun on the display window. According to the witness, the window was a little better than eight feet long, the background about eight feet, and seven and a half to eight feet tall. Dacus testified that he first took out the glass and the door, and then took out the "solid section."

---

[2] Dacus died during the pendency of the appeal to the Circuit Court, from causes unrelated to this claim. The proceeding was revived by order of the Circuit Court in the name of the widow and minor daughter, but the daughter has since died, leaving the widow the sole interested party.

"After taking the glass out, I took the moulding off around the window which was all that held the background in, took a crow bar and prized the background loose from the framing of the window and on one window, I let it down on the floor and from there the boy at the store helped me slide that back to the back of the store and we took it in behind the barber shop.

"Q. You say you picked this piece up and laid it on the floor. About how much did that piece weigh?

"A. That background would weigh approximately one hundred pounds.

"Q. Did you try to lift it by yourself?

"A. Well, all I had to do to get it on the floor was prize it loose and pull it out from the thing and just let it drop, more or less drop to the floor which was about eighteen inches."

Further:

"After that, I had to build a frame down one side of the window in a curve I would say about three and a half or four feet, put in beaver board to make a curved background for part of the window and I put in a celotex ceiling."

This last required Dacus to stand on tip-toe, since the ceiling was about eight feet high. Dacus testified that he had pain in the entire leg, and was taking Miltowns, and codeine tablets to ease the pain. On the 29th, 30th, and 31st of January, shelving was taken out of the window, and Dacus was unable to do further carpentry after that date. He testified that he could not drive a car at that time, and his right leg was "getting stiff, and when I got down, I had to pull myself up." The next week he engaged in stock work until Wednesday, February 5th, at which time he went to bed. As previously set out, Dacus was referred to a Memphis hospital on February 9th, by Dr. Gray, and an operation was performed on February 24th. The period covered by the claim is February 5th to April 15th, during which time Dacus was not at work.

Mrs. Dacus testified that her husband did not appear to be a lot worse during the week of the 20th, but during the week starting the 27th, he apparently suffered considerable pain. She stated that after supper, he would lie down on the couch with a heating pad, and that it was necessary for him to get up two or three times during the night to take tablets to ease the pain.

Mr. Shainberg, one of the employers, testified that he was present in the store while Dacus was working on the window, with the exception of the last two days. Shainberg stated that Dacus did not report any injury, though he did complain of a pain in his leg once or twice, and asked for time off to see Dr. Gray. Shainberg testified that Dacus' testimony relative to the type of work being done, was substantially correct.

According to the testimony of Dr. Gray, Dacus was first treated by him in 1954, and the doctor stated that, at the time, he considered Dacus had a ruptured disc. He testified that he considered the difficulty in the fall of 1957 and winter of 1958 to be the same as suffered by Dacus in 1954. The doctor stated that Dacus came to his office on January 23rd and on the 24th. The witness was asked his opinion of whether the work performed by Dacus during the week of January 27th aggravated the pre-existing condition, and he replied:

"I saw him on January 25, and he was still having a lot of discomfort, and then on the 3rd of February we saw him again, and he returned stating he had more recurrence of the pain in his thigh, and I thought he definitely had a protruding disc and advised him regarding home treatment and to rest. He told me at that time he had been doing some carpenter work, repairing the ceiling, and I certainly would think that would aggravate his condition. The mere fact that he stayed on the job would aggravate it. * * *

"We advise them not to do a lot of heavy lifting and bending of their backs. We try to instruct them how to protect the spine.''

Further:

"I think something aggravated his condition because we had him pretty well asymptomatic on the 25th. That would be on Saturday; then all of that next week apparently he aggravated it because he returned on the 3rd, stating he had a recurrence of pain.  *  *  *

"During that time, I would say his work definitely aggravated his condition."

Dr. Gray stated there are numerous types of activity that affect a disc. "The tendency to rupture will rupture sometimes bending over—sometimes they will rupture with arms overhead, or just swinging a golf club.  *  *  * Sometimes a sneeze, and they will start." He testified that operating a tractor over regular ground would not bother too much; that he had lots of patients operating tractors, but if over rough ground, "It would likely jar the back."

Appellants contend that this award is based on conjecture and speculation. They point out that Dacus was unable to state the day the injury occurred, and in fact, in response to the question, "As a matter of fact, do you know whether you got injured in the store or not?", answered, "I wouldn't swear to it, no." Appellants assert there are many activities that could cause the injury, *i. e.,* receiving a jar while driving a tractor, tripping over logs or stumps while duck hunting, or driving an automobile. They state:

"It is noteworthy that although Dacus testified at length describing the various activities in which he engaged in his work at the store immediately prior to his disability, he does not point out any particular activity that caused him pain or increased his pain, nor does he mention any incident when any of his activities produced any unusual or increased pain. His only statement in this connection was that the leg got progressively worse during that week."

In *Murch-Jarvis Company, Inc.* v. *Townsend,* 209 Ark. 956, 193 S. W. 2d 310, we said:

"There are numerous cases from other jurisdictions holding that a disease, or an aggravation thereof, resulting from inhalation of dust particles or fumes may constitute an accident, or injury, within the meaning of the particular act involved. * * * Appellants insist, however, that appellee did not suffer an accidental injury because no definite date or occasion can be fixed as to when the aggravation happened. Schneider, in his Workmen's Compensation Text, Vol. 4, Perm. Ed., p. 387, has this to say on the question: 'Diversity of opinion exists as to what constitutes the customarily required definite time and place of an accident. On this question the expressions of the courts vary from the statement that "accidents do not happen all day" to decisions to the effect that it may require as much as six months for an accident to culminate in a disabling injury. A reasonably definite time is all that is required.' * * * While there is some confusion in the testimony on the point, there is substantial evidence to support the commission in finding that inhalation of the dust and fumes over a period of several days culminated in total disablement of appellee five or six weeks later. We think the proof meets the requirement that a reasonably definite time and place of accident be shown, and that the commission correctly held that the disablement of appellee resulted from an accidental injury within the meaning of the Workmen's Compensation Law.''

It might be mentioned that there was a conflict in the medical testimony as to whether Townsend's employment (exposure to dust and fumes) actually caused or aggravated a pre-existing diseased condition, which resulted in disability. In the instant litigation, there is no conflicting medical evidence. It is, of course, true that the original injury suffered by Dacus occurred some years prior to the time of his claim, but Dr. Gray's evidence is very positive that the carpentry engaged in by Dacus, requiring, as it did, stooping, and lifting and reaching, aggravated his condition. It is possible, as appellants state, that some other activity might have also aggravated it (though, from the record, the only activity engaged in by Dacus after starting work on the

display window, was riding in an automobile), but we are only here concerned with whether the *activity in question* aggravated his condition; in other words, was it at least a *contributing* cause of the injury. The facts in this case are practically undisputed, and to hold this claim non-compensable, would require a finding that Dr. Gray's testimony did not constitute substantial evidence. We are unable to make such a finding.

Affirmed.